RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0090p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

PETER J. MAGER,

> *Plaintiff-Appellant*,

*v.*

WISCONSIN CENTRAL LTD.,

> *Defendant-Appellee*.

No. 18-1421

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:16-cv-00145—Gordon J. Quist, District Judge.

Argued: April 30, 2019

Decided and Filed: May 15, 2019

Before: GUY, SUTTON, and NALBANDIAN, Circuit Judges.

───────────────

### COUNSEL

**ARGUED:** Michael B. Gunzburg, RIDGE & DOWNES, Chicago, Illinois, for Appellant. Mary C. O'Donnell, GALLAGHER SHARP LLP, Detroit, Michigan, for Appellee. **ON BRIEF:** Michael B. Gunzburg, James T. Foley, RIDGE & DOWNES, Chicago, Illinois, for Appellant. Mary C. O'Donnell, GALLAGHER SHARP LLP, Detroit, Michigan, for Appellee.

GUY, J., delivered the opinion of the court in which SUTTON and NALBANDIAN, JJ., joined. SUTTON, J. (pp. 12–14), delivered a separate concurring opinion.

───────────────

### OPINION

───────────────

RALPH B. GUY, JR., Circuit Judge. Peter Mager sought to recover damages under the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51, *et seq.*, for injuries he allegedly

sustained while employed by Wisconsin Central Ltd. (WCL) as a trackman at a railway yard near Marquette, Michigan.  Mager appeals the dismissal of his complaint with prejudice, which was ordered as a sanction primarily for his and his attorney's conduct at a court-ordered independent medical examination.  Reviewing the dismissal for abuse of discretion, we affirm.

**I.**

Mager alleged that he was seriously and permanently injured on July 29, 2013, when he slipped on hydraulic oil that had leaked onto the rear deck of a truck where he was working. Mager filed suit in June 2016, was deposed in June 2017, and was sent notice that defendant had scheduled an independent medical examination (IME) in early August 2017.  Plaintiff's counsel, James T. Foley, objected to the IME because the examiner's office was in Appleton, Wisconsin—a substantial drive from where Mager lived in the Upper Peninsula of Michigan. That prompted WCL, through its counsel Mary O'Donnell, to move both for an order compelling the IME pursuant to Rule 35(a) of the Federal Rules of Civil Procedure and to delay the third-party mediation scheduled for late August 2017.  At a hearing on the motion on September 27, counsel reached an agreement at the magistrate judge's urging.  Namely, it was agreed that Mager would submit to the IME, that WCL would pay his mileage, and that a settlement conference would be scheduled with the court in lieu of mediation.  A new Case Management Order was promptly entered on September 28, 2017.

Once the IME was rescheduled, Mager was asked to complete a five-page written questionnaire prior to the appointment.  That questionnaire—which is in the record—inquired into Mager's complaints, medical history, medications, prior evaluations, and how and where his injury occurred.  When Foley objected to the questionnaire as unnecessary in light of plaintiff's recent deposition, O'Donnell brought the matter before the magistrate judge by way of a conference call.  O'Donnell asked that Mager be required to either complete the questionnaire or be interviewed by a doctor's assistant.  The magistrate judge "determined that background information was necessary for the IME."  Accordingly, a Rule 35 Order was entered the next day expressly directing Mager to "appear at the IME on October 20, 2017 at 10:00 a.m. C.S.T., *for an interview by a physician assistant and for Dr. Revord to conduct an IME*.  The interview and exam shall not exceed three (3) hours."  (Emphasis added.)  No other conditions were specified.

Mager appeared for the IME as directed and was joined there by his attorney James Foley, who not only remained present throughout the appointment but also surreptitiously made an audio recording of the visit.  Later, Foley conceded that he did so without prior notice to defense counsel; stated that he regularly attended IMEs with other clients; and explained that he had determined ahead of time that one-party-consent recording is legal in Wisconsin.  As a result of that recording, however, there can be no dispute that Mager himself repeatedly declined to answer relevant questions about his condition, his medications, and how the injury occurred.

An unofficial transcript of the recording[1] reflects that although Mager provided some identifying information to the receptionist upon arrival, he and Foley did not allow his driver's license to be copied.  An assistant then escorted Mager and Foley to an exam room, where she attempted to conduct an interview.  Mager was asked what problems or concerns he wanted to have addressed—one of the questions highlighted on the questionnaire—but Mager would not do so and said he had already answered questions about his problems during his deposition.  Foley interjected that Mager was there to be evaluated at defendant's request and not to have any problems addressed.  The assistant explained that the doctor still wanted some of the questions answered, but Mager replied that he was sure that they had all of his medical records.  Finally, Mager declined to list the medications he was taking, again referring the assistant to the deposition transcript that he had brought with him.  That concluded the assistant's attempt to interview Mager.

Forewarned, Dr. Revord introduced himself to Mager and Foley; confirmed that Mager did not want to answer any questions; indicated that he had reviewed Mager's records; and took the copy of Mager's deposition when it was offered.  During that exchange, Foley also stated that Mager was "not trying to be an obstructionist" but did not want to "rehash" his deposition testimony.  Dr. Revord explained that he was there to see Mager, listen to his story, and write a report evaluating his condition and what had caused it.  Dr. Revord tried to ask about how the injury occurred and about Mager's physical problems, but Mager referred him to the deposition

---

[1]In fairly contentious briefing, WCL's counsel impugns the transcript because it was made by an unidentified individual in Foley's office.  Despite having received a copy of the recording, however, WCL does not suggest that the transcript is inaccurate in any way.  Indeed, WCL relies on that very transcript as proof of deliberate violation of the Rule 35 Order.

for those answers.  The full exchange was as follows:

> [Dr. Revord]: . . .  Now I was a little confused.  You're talking in the summons of oil and slipping in the back of a truck but on your, when you filled out the injury report that day, you were saying you were walking to the front door of the truck and your legs gave way.
>
> [Peter Mager]:  Everything is in the deposition there.
>
> DR:  Got it.
>
> PM:  We went over all the, all the stuff.
>
> DR:  Got it.
>
> PM:  I'm not trying to give you a hard time.
>
> DR:  I understand.
>
> PM:  All the information should be there.
>
> DR:  I think you are smart to listen to your attorney.  If your attorney, if my attorney told me to dye my hair red, I'd dye my hair red.  You know, so if your attorney has told you not to …
>
> [FOLEY]:  You're assuming I told him that.
>
> DR:  to answer specific questions.
>
> JTF:  That might be his own, his own line of thinking.
>
> DR:  He had told me, we had been told, eh, that . . .  Well is it, let me ask you, is it your idea not to fill out the form?
>
> JTF:  That's not relevant doc.
>
> PM:  I'm complying with the Order.  They told me I had to come down here and be examined by you.
>
> DR:  Very good.  Ok I will go with the history in the chart and what you said when you filled out the initial report.
>
> (inaudible)
>
> Ok great.  Do you want to tell me what problems you are having or would you rather I just look at your deposition?
>
> PM:  It's all in the deposition.

Mager then complied as Dr. Revord conducted a physical examination.  Lastly, Dr. Revord asked Mager what medications he was currently taking, but Mager declined to answer and responded that it was all in his deposition and medical records.  That concluded the IME.

Dr. Revord prepared a six-page report the same day, which noted Mager's refusals to answer questions, relied on a review of Mager's medical and other records, and concluded—in short—that Mager presented with a "volitional" tremor, had no significant pathology in his lumbar region, required no further treatment, and was asserting contradictory claims about how the injury occurred. The report added that Mager's deposition "did not contain the answers to the questions [Dr. Revord] was asking him." The deposition itself is not part of the district court record.[2]

Ten days later, WCL moved to dismiss the complaint pursuant to Rule 37(b)(2)(A)(v) of the Federal Rules of Civil Procedure because Mager had violated the "spirit and letter" of the Rule 35 Order. WCL also argued that it had been denied the opportunity to object to Foley's presence or to have the magistrate judge consider whether to allow Foley's presence as a condition of the IME. Plaintiff's response to the motion was filed one day late—at 1:30 a.m. on November 15—and revealed the audio recording. Defendant replied on November 21.

A hearing was held on November 28, 2017, which also was the date set for the agreed settlement conference. That conference was cancelled, however, because Foley had failed to send a "confidential settlement letter" to the magistrate judge as directed by the Case Management Order. Although the magistrate judge indicated his intention to impose monetary sanctions on counsel for that failure, an order to that effect was not entered prior to the dismissal.

Next, the magistrate judge asked Foley about his and his client's conduct at the IME. Foley insisted that Mager had complied by appearing to be interviewed; stated that he was present at Mager's request; and explained that both his presence and the recording were in response to concerns that the IME might be used as a "de facto deposition." O'Donnell countered that the circumstances showed intentional defiance of the court's order. On December 28, 2017, the magistrate judge issued a report and recommendation setting forth the facts, addressing the relevant factors, and concluding that dismissal was warranted because of the "flagrant and repeated misconduct exhibited by Plaintiff and his attorney." Over plaintiff's objections, the district court adopted the R&R and dismissed the complaint with prejudice on

---

[2]Dr. Revord's report also commented that although Mager had refused to provide identification, "claimant appears to be the same individual . . . [in] photographs provided to me." Nothing in the record suggests otherwise.

March 9, 2018.  Plaintiff appealed, and, notably, he is no longer represented by Foley.

**II.**

The decision to dismiss a complaint for failure to comply with a discovery obligation or other court order is reviewed for abuse of discretion.  *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976) (per curiam); *see also Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 363 (6th Cir. 1999); *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 366 (6th Cir. 1997).

Rule 37(b) specifically authorizes the imposition of sanctions for failure to comply with a Rule 35 Order, or for failing to obey a scheduling or other pretrial order under Rule 16(f)(1)(C) of the Federal Rules of Civil Procedure.  Under Rule 37(b)(2)(A), "a district court may sanction parties who fail to comply with its orders in a variety of ways, including dismissal of the lawsuit."  *Bass v. Jostens, Inc.*, 71 F.3d 237, 241 (6th Cir. 1995).  Four factors are to be considered in determining whether dismissal is an appropriate sanction for failure to comply with a discovery obligation or other court order:

> (1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered.

*United States v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002) (quoting *Knoll*, 176 F.3d at 363). "Although no one factor is dispositive, dismissal is proper if the record demonstrates delay or contumacious conduct."  *Id.*; *see also Harmon*, 110 F.3d at 366-67.  "Contumacious conduct refers to behavior that is perverse in resisting authority and stubbornly disobedient."  *Carpenter v. City of Flint*, 723 F.3d 700, 705 (6th Cir. 2013) (citation and internal quotation marks omitted).[3]

---

[3]When Rule 37(b) applies, there is no need to rely on the court's inherent powers or on Rule 41(b)'s authorization to dismiss for failure "to prosecute or to comply with these rules or a court order."  Fed. R. Civ. P. 41(b); *see also Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 207 (1958).

## A.    Willfulness, Bad Faith, or Fault

To show that a party's failure to comply was motivated by bad faith, willfulness, or fault, the conduct "must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of [his] conduct on those proceedings." *Carpenter*, 723 F.3d at 705 (alteration in original) (quoting *Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2005)).  This court has expressed reluctance to uphold a dismissal "merely to discipline an errant attorney" to the detriment of an innocent client.  *Knoll*, 176 F.3d at 363 (citation omitted); *see also Mulbah v. Detroit Bd. of Educ.*, 261 F.3d 586, 590 (6th Cir. 2001).  Thus, notwithstanding the Supreme Court's declaration that dismissal of a plaintiff's complaint based on his attorney's unexcused conduct would *not* impose an undue penalty on the client in *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962), this court has instructed that "[d]ismissal is usually inappropriate where the neglect is solely the fault of the attorney," *Carpenter*, 723 F.3d at 704 (alteration in original and citation omitted).

Here, although there were some failures that were attributable solely to counsel, the magistrate judge expressly found that "Plaintiff and his attorney acted in bad faith and willfully violated the [Rule 35] discovery order" that "required Plaintiff to submit to an interview." Because that finding is supported by the record, it was not an abuse of discretion to find this factor weighs in favor of dismissal.

***Late or Missing Filings.***  The magistrate judge identified two instances of failure to comply with a scheduling or pretrial order:  (1) the tardy filing of the response to the motion to dismiss; and (2) the failure to submit the confidential settlement letter to the magistrate judge. Submission of a settlement letter was expressly required by court order.  The failure to submit the letter caused the cancellation of the settlement conference on the day it was scheduled to occur, and the magistrate judge indicated his intention to impose sanctions at the time.

***Violation of Rule 35 Order.***  A court "may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a)(1).  The order is to be "made only on a motion for good cause," and "must specify the time, place, manner, conditions, and scope of the

examination, as well as the person or persons who will perform it." Fed. R. Civ. P. 35(a)(2)(A), (B). There is no dispute that Mager's physical condition was in controversy. Both the extent and cause of his injuries were contested and central to his claim, and counsel agreed that he would submit to the examination on the condition that defendant pay his mileage. Plaintiff relies on email correspondence to suggest that it was defense counsel who asked that the questionnaire be completed. Be that as it may, what matters is that, as the magistrate judge found, the order requiring Mager to submit to an interview "was the result of a telephone conference in which Plaintiff's counsel discussed his concerns with allowing an interview." In other words, notwithstanding Foley's objections and concerns, Mager was expressly ordered to submit to an interview as part of the IME.

Mager cannot credibly claim either that he was unaware of the obligation or that he complied with it by sitting for the interview but declining to answer questions regarding his condition, his current medications, or how his injury occurred. Foley represented that he and Mager had discussed their concerns about the interview, and Foley denied that he told Mager what to do. The fact is, Mager arrived for the IME with a copy of his deposition transcript and his attorney in tow, and then proceeded to repeatedly deflect questions by stating that the answers could be found in his deposition or prior medical records. Now that he is no longer represented by Foley, plaintiff asserts that it "was unreasonable for the court to conclude that he did anything other than follow the instructions of his attorney when he attended the IME." But Mager cannot escape the consequences of his own actions by laying blame on the advice of counsel. The actions that Mager took with the support of Foley were deliberate and calculated to circumvent the order requiring him to submit to an interview as part of the IME.

***Counsel's Presence and Secret Recording***. Although not a violation of the Rule 35 Order itself, the magistrate judge found that Foley's unexpected attendance at and surreptitious recording of the IME "show[ed] bad faith and a lack of respect for the integrity of the legal profession." Plaintiff's new counsel concedes that Foley "should have discussed his desire to attend and record the IME with opposing counsel and, if necessary, raised the issue with the court prior to the IME." Admitting that Foley's conduct should not be condoned, plaintiff argues that Mager had no way of knowing that it was improper. But Mager's hands are not so clean.

Foley and Mager were concerned that the examiner was a defense-side expert who may try to elicit information adverse to their case—*i.e.*, the "de facto" deposition argument—and "discussed the advantages of audio-taping the entire IME event." (Pl's Br., p. 17.) There is no reason to doubt that Mager knew Foley was secretly recording the visit on a hidden cell phone, which was deceitful even if not actually illegal in Wisconsin. That recording, in turn, shows that Foley's presence provided support to Mager and furthered the concerted and deliberate effort to thwart the court-ordered interview and avoid questions they did not want to have to answer. Plaintiff's new counsel acknowledges that "[e]ven in state courts where attorneys often attend and videotape an IME, it is most often done with notice to opposing counsel." (Reply Br., p. 5.) It should also go without saying, that, even then, the recording would be done in the open.

***Failure to Request Conditions.*** These actions were found to be particularly egregious because plaintiff's counsel knew or should have known that "federal courts generally do not allow a third-party to be present during an IME or to have an IME recorded unless the party has established a special need or good cause." Plaintiff does not dispute that this is the general rule, although this court has not had occasion to address the parameters of the trial court's discretion to grant or deny such a request. *See, e.g.*, *Elder v. Harrison Twp.*, No. 10-cv-13144, 2014 WL 6668696, at *3-5 (E.D. Mich. Nov. 24, 2014) (finding inherently adversarial nature was not sufficient reason); *Lahar v. Oakland Cty.*, No. 05-72920, 2006 WL 2269340, at *7-8 (E.D. Mich. Aug. 8, 2006) (finding interest in assuring accuracy was insufficient reason); *but see Gohl v. Livonia Pub. Schs.*, No. 12-cv-15199, 2015 WL 1469749, at *2-5 (E.D. Mich. Mar. 30, 2015) (allowing parental presence for exam of children with cognitive deficiencies but finding no good cause for it to be recorded).

Nor is there reason to think the state courts would condone what happened here. *See, e.g.*, *Metro. Prop. & Cas. v. Overstreet*, 103 S.W.3d 31, 39 (Ky. 2003) (Kentucky's similar rule allows third persons to attend where there is good cause, although an attorney's presence is "most likely to be problematic because of the potential to unfairly disrupt the examination"). Indeed, even though Michigan law provides a statutory right to have counsel present during an

IME, that condition would be included in the order. *See* Mich. Ct. R. 2.311 (order "may provide that the attorney for the person to be examined may be present at the examination").[4]

It was not an abuse of discretion to find that the concerted actions of plaintiff and his attorney displayed an intent to thwart the judicial proceedings, or at least a reckless disregard for the effect of that conduct on the proceedings. Nor is this a case in which the dismissal was merely to discipline an attorney "to the detriment of an innocent client." *Knoll*, 176 F.3d at 363. This factor weighs in favor of dismissal.

### B. Prejudice to the Adversary

As noted earlier, plaintiff conceded that prejudice resulted from the cancellation of the settlement conference on the day it was scheduled to occur. The magistrate judge also found that WCL was prejudiced because Mager and Foley failed to comply with the order requiring him to submit to an interview as part of the IME. Plaintiff argues that there was no prejudice because the refusals did not prevent Dr. Revord from preparing his report and providing an opinion based on a physical examination and review of the prior medical records. In fact, the report did not identify the conditions that Mager claimed were disabling, describe the manner of the injury, or list the medications he was taking at the time. Nor did Dr. Revord believe the deposition answered the questions he was asking. Plaintiff counters that Dr. Revord did not insist on answers, but Dr. Revord was not wrong in believing that it was not his place to do so. The magistrate judge found that WCL was prevented "from receiving an expert report with all the medical information that the physician was seeking." Although the report was favorable to the defense, it was arguably incomplete and potentially subject to impeachment. Plaintiff has not shown it was clear error to conclude that the deliberate circumvention of the Rule 35 Order prejudiced the ability of the defense to rely on the IME report.

---

[4]Plaintiff's new counsel wisely abandoned reliance on Wright & Miller, which observes that "the norm in federal court is that counsel will not be allowed to attend unless good cause is presented to justify that." 8B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2236 at 496 (3d ed. 2010). That same passage also explains that concerns about overreaching or abusive behavior during an IME "can be minimized in other ways, particularly by excluding from evidence any statements made by the party to the doctor relating to nonmedical matters." *Id*.

## C. Prior Warning

The magistrate judge recognized that plaintiff was not expressly warned that failure to comply with the Rule 35 Order could lead to dismissal, although WCL's motion provided some notice that dismissal was a possibility. *See Reyes*, 307 F.3d at 458. When "a plaintiff has not been given notice that dismissal is contemplated, a district court should impose a penalty short of dismissal unless the derelict party has engaged in bad faith or contumacious conduct." *Harmon*, 110 F.3d at 367 (internal quotation marks omitted) (quoting *Harris v. Callwood*, 844 F.2d 1254, 1256 (6th Cir. 1988)). As is discussed at length above, the record supports the conclusion that plaintiff and his attorney deliberately disobeyed the Rule 35 Order through the calculated refusals to answer questions during the IME. As such, the lack of a prior warning would not prevent dismissal of the complaint as a first sanction.

## D. Alternative Sanctions

The fourth factor asks whether less drastic sanctions were imposed or considered before dismissal was ordered. They were. The magistrate judge explained that he "considered lesser sanctions, such as imposing costs for the IME, striking Plaintiff's own expert witnesses, and/or striking Plaintiff's claim for permanent disability" but found that "[n]one of these sanctions would reflect the seriousness of the conduct in this case." This consideration also supports the decision to dismiss the complaint pursuant to Rule 37(b)(2)(A)(v).

**AFFIRMED**.

———————————

**CONCURRENCE**

———————————

SUTTON, Circuit Judge, concurring.  I join Judge Guy's well-reasoned opinion in full.  I write separately to emphasize the propriety of holding parties accountable for their lawyers' actions.

Our system of representative litigation makes the parties principals, the lawyers agents.  *See* Restatement (Third) of Agency § 1.01 reporter's note c (Am. Law Inst. 2006); Restatement (Third) of the Law Governing Lawyers § 26 cmt. b (Am. Law Inst. 2000); William A. Gregory, *The Law of Agency and Partnership* § 21 (3d ed. 2001).  Under tried and true agency principles, parties become bound by the actions of lawyers taken with actual or apparent authority.  Restatement (Third) of Agency §§ 2.01–.03; Restatement (Third) of the Law Governing Lawyers §§ 26–27.  That understanding has deep roots, centuries-deep roots, in the common law.  The thirteenth-century jurist Henry de Bracton wrote that "the attorney represents the person of his lord in almost all matters."  4 Bracton, *On the Laws and Customs of England* 85 (George E. Woodbine ed., Samuel E. Thorne trans., 1977).  By Justice Oliver Wendell Holmes' time, the idea had become cliché, the well-worn adage being that the "act of the attorney is the act of his client."  Oliver Wendell Holmes, Jr., *Agency*, 5 Harv. L. Rev. 1, 7–8 (1891) (quotation omitted).

This representative ideal pervades every aspect of our modern legal system.  We stylize our cases as contests of "Plaintiff v. Defendant" even though the combatants who appear behind the lectern are lawyers, not parties.  We write that "plaintiff argues so-and-so," full well knowing that the client often hasn't the foggiest about the obscure arguments his lawyer just submitted on his behalf.  The concept even suffuses our vocabulary.  The word attorney means one who is attorned—in other words, a person appointed to act for another.  1 *Oxford English Dictionary* 772 (2d ed. 1989).  Trying to pry apart a lawyer's representational actions from those of his client is like trying to separate Mark Twain from Samuel Clemens.

One implication of this foundational principle is that parties must be held accountable for their attorneys' misconduct.  That's why there is "certainly no merit to the contention that

dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962). "Any other notion," the Court added, "would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." *Id.* at 634 (quotation omitted). In the past fifty years, the Court has hammered the point over and over. *See Maples v. Thomas*, 565 U.S. 266, 280–81 (2012); *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 396–37 (1993); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 92–93 (1990); *United States v. Boyle*, 469 U.S. 241, 249–50 (1985).

Even so, our circuit remains queasy about *Link*'s iron-clad logic in sanction cases like this one. Reasoning that dismissal with prejudice unfairly punishes a plaintiff for his lawyer's misdeeds, we have "expressed an extreme reluctance to uphold the dismissal of a case merely to discipline a party's attorney." *Mulbah v. Detroit Bd. of Educ.*, 261 F.3d 586, 590 (6th Cir. 2001); *see also Patterson v. Grand Blanc Twp.*, 760 F.2d 686, 688 (6th Cir. 1985) (per curiam). So it is that "[d]ismissal is usually inappropriate where the neglect is solely the fault of the attorney." *Carpenter v. City of Flint*, 723 F.3d 700, 704 (6th Cir. 2013) (quotation omitted).

This sentiment is unfair to the defendant, is inconsistent with other areas of the law, and may do more harm than good for the party it tries to help: the plaintiff. Why should a defendant be made to endure abuses by a plaintiff's lawyer just because the plaintiff was unaware? That is not the way we usually think about it. *See Link*, 370 U.S. at 634 n.10. Our anxiety about harming blameless plaintiffs also breaks sharply from our usual practices. When a plaintiff loses his case because his lawyer filed the complaint outside the statute of limitations, we rarely pause to ask whether the client was responsible for the delay. *See, e.g., Rocheleau v. Elder Living Constr., LLC*, 814 F.3d 398, 400–01 (6th Cir. 2016). In that situation, we treat the lawyer's actions as those of his client, no matter how steep the cost.

The law already marks a deeply grooved path for addressing the grievances of clients bilked out of good claims by bad lawyers. It's called a malpractice lawsuit. *See Link*, 370 U.S.

at 634 n.10; *Inman v. Am. Home Furniture Placement, Inc.*, 120 F.3d 117, 119 (8th Cir. 1997). A dismissal with prejudice predicated on lawyer misconduct would provide powerful ammunition for a client in a malpractice proceeding. *See* Restatement (Third) of the Law Governing Lawyers § 53 cmt. b. By departing from our traditional rules of agency to protect plaintiffs, we may do just the opposite. If we make party misconduct a near precondition in every dismissal, we unduly complicate the inevitable malpractice action by giving the lawyer a ready defense: My client behaved just as badly as I did. *See Carpenter*, 723 F.3d at 704.

Left to my own devices, I would take a different tack. While a party's conduct may enter the equation in determining whether to dismiss the case with prejudice as a sanction, we should not make it a near precondition for doing so.